# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### EUGENE DIVISION

C.S. *ex rel.* K.C.; K.C. *ex rel* L.C.; T.B. *ex
rel.* C.B.; B.B. *ex rel* C. B.; T.C. *ex rel* L.C.,
on their own behalf and on behalf of all
those similarly situated,

               Plaintiff,

v.

CLYDE SAIKI, in his official capacity as
Director of Department of Human Services,
State of Oregon; and LILIA TENINTY, in
her official capacity as the Director of the
Office of Developmental Disabilities
Services, Oregon Department of Human
Services,

               Defendants.

Civ. No. 6:17-cv-00564

CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF

Civil Rights Action (42 U.S.C. 1983, U.S.
Const., Amdt. XIV, 42 U.S.C. 12131 *et seq*.,
29 U.S.C. 794, Social Security Act, Chapter
XIX, 42 U.S.C. 1396 *et seq.*)

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

      C.S., K.C., T.B., B.B., T.C., and thousands of other people with intellectual and

developmental disabilities around Oregon receive benefits through Oregon's Office of

Developmental Disabilities, including state-funded in-home care services. In the past seven

months, those in-home care hours have been cut for virtually every person in Oregon entitled to

those in-home care hours. In notices to the people affected by the cuts, the defendants

(collectively, "DHS") supplied no individualized explanation for those cuts, justifying them only

by citing to an opaque needs assessment tool, whose operation is not explained in the notice or

anywhere else. No one receiving a similar notice would understand what changes to their in-

home care hours were attributable to alleged changes in individual need or what changes were

Page 1- CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

attributable to statewide cuts to service hours.  The arbitrary manner in which they were notified

of the slashed supports, without a meaningful explanation of the reasons for reduced supports,

violates the Due Process Clause of the Fourteenth Amendment.

The reductions in services to people with disabilities also put some members of the class

at serious risk of segregation and isolation, in violation of the integration mandate of the

Americans with Disabilities Act and the Rehabilitation Act. The state would pay for full-time

care for any person forced into a nursing home or a residential placement by these cuts, but

denies that same level of care in the community, where the care would be cheaper and more

effective. The cuts also prevent people who live at home, like B.B. and T.C., from going out into

the community because they cannot go out without adequate behavioral supports. The ADA was

designed to eliminate discrimination against people with disabilities, including the unnecessary

removal from integrated settings and the unnecessary isolation of people with disabilities who

could live in and mix with the community.

The state's systemic service cuts and its unreasonable and arbitrary constructions of its

own rules also violate the terms of the Medicaid Act. The state receives a higher level of federal

reimbursement, on the condition that the state provide consumer-directed, home-based care that

fully meets the medical needs of individuals with developmental and intellectual disabilities. 42

U.S.C. 1396n(k). The state may not ration or cut benefits in a manner that fails to meet the

medical and social needs of eligible consumers.

The plaintiffs ask the court to hold the state to the standards set for it by law: to provide

care that meets the needs of the people with disabilities that it serves, to favor in-home and

community-based services over segregation and isolation of people with disabilities, to base its

decision-making on consumer-oriented, transparent, and means-tested metrics, and to explain the

reasons for cuts in services in a manner that allows a layperson to understand them and, when appropriate, to challenge those decisions.

**PARTIES**

1.      C.S. is a 9-year-old boy who lives in Clackamas County. He has autism spectrum disorder and has difficulty managing his behaviors and daily hygiene. He receives in-home care supports to help manage his behavioral outbursts.

2.      K.C. is C.S.'s mother. She lives in Clackamas County.

3.      K.C. is a forty-year-old woman who lives in Harney County in eastern Oregon. She has cerebral palsy, a disability that negatively affects her ability to walk, to eat, to think, and to engage in other daily functions without assistance. She receives in-home care supports funded through DHS to support her needs.

4.      L.C. is K.C.'s mother. She lives with her in Harney County in eastern Oregon.

5.      T.B. is a 28-year-old man who lives in East Portland. He has autism, a disability that negatively affects his ability to think, to maintain personal hygiene, and to process social cues.

6.      B.B. is a 34-year-old man who lives in East Portland. He has autism, a disability that negatively affects his ability to think, to eat, to manage his medical needs, and to manage his own safety.

7.      C.B. is the mother of T.B. and B.B. She lives with both of them in East Portland.

8.      T.C. is a 21-year-old woman who lives in Douglas County, Oregon. She has cerebral palsy, a history of traumatic brain injury, and a seizure disorder, disabilities that negatively affect her ability to communicate, to walk, to eat, and to manage other substantial needs.

9.      L.C. is T.C.'s mother. She lives with her in Douglas County.

10.     Clyde Saiki is the Secretary of the Department of Human Services. The Department of Human Services is an agency of the state of Oregon that delivers and administers a wide variety of social services to Oregonians, including Oregonians with disabilities. It includes, as one of its Divisions, the Office of Developmental Disability Services.

11.     Lilia Teninty is the Director of the state of Oregon's Office of Developmental Disability Services, a unit within the state Department of Human Services. She is charged with administering state programs relating to services for children and adults with intellectual disabilities or developmental disabilities. She is sued in her official capacity only.

## JURISDICTION AND VENUE

12.     This case raises claims under the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. 794, and Chapter XIX of the Social Security Act, 42 U.S.C. 1396 *et seq*. All claims raised are within the federal subject matter jurisdiction of a United States District Court under 28 U.S.C. 1331 & 28 U.S.C. 1343.

13.     Each of the parties resides in the state of Oregon, and a substantial part of the events leading up to this suit took place in the state of Oregon. Venue is appropriate in the district of Oregon. 28 U.S.C. 1391.

14.     The policy challenged in this action has been implemented and has effects in every county in Oregon. DHS headquarters are in in the state capital, Salem, in Marion County. DHS engages in substantial activity in administering the program of in-home supports in every county in the state. K.C. resides in the Pendleton Division. T.C. resides in the Eugene Division. C.S., T.B., and B.B. reside in the Portland Division. Divisional venue is proper in any division of the district. LR 3-2.

## STATEMENT OF FACTS

### *DHS Processes for Assessment, Reduction, and Review*

15.     The plaintiffs' personal services workers are funded with federal Medicaid money, distributed through the Office of Developmental Disabilities of the Department of Human Services and through its contractors.

16.     DHS contracts with county developmental disability programs and county-wide brokerage services to administer the case management services for these programs, under the rules created by DHS.

17.     For instance, the contracting entity for Harney County is Resource Connections of Oregon. In Douglas County, the contractor is Community Living Case Management. B.B. and T.B. receive case work services through Inclusion, Inc.

18.     These local contractors are responsible for assessing the eligibility of consumers like the plaintiffs for developmental disability services, organizing the continuing assessment of need for services, managing the payment of personal service workers, and notifying consumers of when their services will be reduced or terminated.

### *The Needs Assessment Process*

19.     Each year, the needs of people receiving in-home care services must be re-evaluated using the state's needs assessment tool.

20.     The needs assessment tool, named the Adult Needs Assessment (ANA), is DHS's primary tool for determining the scope of the adult consumer's need. DHS also uses an equivalent needs assessment tool for child consumers, the Child Needs Assessment (CNA).

21.     The ANA has gone through several different versions, labeled as version A, version B, etc. The most current version is the ANA-D.

22.     The needs assessment reviews specific areas of potential need for assistance, including: eating, food preparation, toileting, communication, behavioral assistance, medication administration, and bathing.

23.     An evaluator using the needs assessment must assess the degree of need and select from pre-created qualitative categories of need, such as by indicating whether the consumer needs full assistance in performing that task, whether the client can accomplish the task with partial assistance, or whether the consumer can perform the task independently and without any assistance.

24.     The needs assessment contains an internal and undisclosed algorithm. Based on this algorithm and based on the answers provided by the evaluator, the needs assessment automatically generates a statement of the hours budgeted for in-home care as to each consumer.

25.     DHS has altered the algorithm in the different versions of the needs assessment to generate more or fewer hours for the same level of need.

26.     The most recent version of the needs assessment, the ANA-D, was designed to sharply reduce the number of hours generated for any particular level of need, by roughly 30% for all consumers. On information and belief, these undisclosed changes made to the ANA-D result in major  reductions to those with substantial needs, even in situations where the consumer's needs have not changed since the prior assessment.

27.     The allegations listed above for the Adult Needs Assessment are similarly true for the Child Needs Assessment tool. DHS has also updated the children's version of the needs assessment that similarly relies on an internal and undisclosed algorithm. Its most recent version is the CNA-D. Its operation results in a roughly 30% service cut for all consumers.

28.     Under DHS rules, a consumer's service level—meaning the total hours of in-home care to which they are entitled—is wholly defined by the needs assessment tool. OAR 411-450-0020(21) (defining "service level"); 411-330-0060(5)(a)(using "service level" to define limits of services).

29.     The relationship between a consumer's need and the hours of care she receives is entirely determined by "a formula embedded in the functional needs assessment." OAR 411-450-0020(21). There is no meaningful way for a consumer to review or understand this formula.

*Notice to the Consumer*

30.     DHS issues a model notice for reductions in in-home care hours for local caseworkers to use, termed by DHS a Notification of Planned Action.[1]

31.     The template notice offers a boilerplate explanation of changes in the needs assessment and then explains to the consumer that:

> A functional needs assessment was performed on MM/DD/YYYY.  This assessment found you to be eligible for yyy hours of Attendant Care/Skills Training.  You were previously authorized to receive xxx hours of Attendant Care/Skills Training. The Department has determined on the basis of your functional needs assessment on MM/DD/YYYY that your current amount of xxx hours of Attendant Care and Skills Training exceed what you need to live independently in a community-based setting, and that you only need yyy hours to live independently in a community-based setting. Your service plan is being reduced from XXX to YYY hours per month, effective MM/DD/YYYY.

32.     The notice provides no further individualized explanation of the reason for the reduction in services. It does not tell the client which assessed needs have gone up, down, or remained the same. It does not explain how the assessment reached the specific number of hours or what factors were considered in reaching that decision.

---

[1] *See* Oregon Department of Human Services, Notification of Planned Action, *at* http://www.oregon.gov/DHS/SENIORSDISABILITIES/DD/ExceptionsANACNA/reduction-nopa-template.doc

33.     The model notice explains to consumers that they have a right to appeal and how to appeal the reduction in hours.

34.     The model notice and the actual notices received by the plaintiffs *do not* tell DHS clients about the exceptions process. DHS clients would have to separately discover what the exceptions process is, determine whether it would be helpful, and inquire how to apply.

*Exceptions Process*

35.     The exceptions process (sometimes called "funding review") is a separate means, outside the administrative appeals process, of challenging a reduction in hours or denial of a particular benefit. The exceptions process is used to obtain benefits outside DHS's internal limits on services and benefits. Some people are entitled to high levels of benefits or services, but the design of the needs assessment tools do not permit granting those services or benefits.

36.     A DHS client, a close relative, or a county case worker can file an exception, seeking benefits or services outside service limits. The decision as to whether to grant an exception is made by the exceptions committee, whose membership is not publicly available.

37.     The client can submit documentary evidence to DHS seeking the exception, but has no right to appear directly before the exceptions committee, no right to testify or make argument, nor any right to call witnesses. Because of the limited notice given to consumers as to the reasons for the reduction, the consumer must only guess what evidence will be compelling to the committee.

38.     A recent review of the exceptions process for approval of assistive technology revealed that the exceptions committee often denied exceptions requests on the grounds that important information was not provided, even where that information was actually in the client file.

Exceptions requests were also denied for lack of certain required information, even when that requirement was not established in any statute or rule.

39.     When the exceptions committee decides to deny a request based on insufficient documentation, the consumer has no right to supplement the record with that document, once she finds out what documentation the committee is actually looking for.

40.     An exception may be granted where one of three provisions of the Oregon Administrative Rules apply: where the need for care is irregular and unpredictable; where the time required to address a specific need is uniquely long for that individual; or where the reduced service hours put that person at risk of institutionalization. OAR 411-450-0060 (7)(e). A review of notices coming out of this process reveal that the answer rarely contains any individualized information, just a general denial that the consumer met any of the three grounds for an exception.

41.     The exceptions process is an opaque one, in which the consumer has little to no right to participate, where decisions are made arbitrarily and without reference to established standards.

*Administrative Appeals Process*

42.     The model notice instructs consumers of the right to file an administrative appeal to the reduction in service hours. Some people receiving exceptions denials also receive notices informing them of the right to file an administrative appeal.

43.     A person can appeal the reduction in service hours to an administrative appeal, but the rules sharply limit any meaningful way for a consumer to prevail at such a hearing.

44.     By administrative rule, a person is entitled only to the hours determined by the needs assessment. OAR 411-450-0020(21); OAR 411-330-0060(5)(a). Though one can proceed to the administrative hearing, a person cannot prevail by arguing that the assessment inadequately

captured the consumer's unique needs or that, although the individual need was correctly determined, the number of hours budgeted for care are inadequate to meet those needs.

45.    Consumers simply do not have viable arguments in pursuing administrative appeals of the original reduction in hours.

46.     The notices advise consumers that they can have continuing services during the pendency of an appeal, but the notice also cautions consumers that DHS may pursue reimbursement for any continuing services if the individual does not succeed on appeal. These cautions may deter individuals from seeking continuing services pending appeal.

47.    Consumers who filed for an exception unsuccessfully or who had only partial relief granted by the exceptions committee have recently been granted the opportunity to appeal the outcome of the exceptions process. Judges reviewing those claims have considered whether the appellant has met any of the three grounds outlined in the Oregon Administrative Rules. OAR 411-450-0060(7)(e).

*Individual Allegations: C.S.*

48.    C.S can live at home with his mother, as long as he has adequate supports at school and in his home to manage his behavior. Without those supports, C.S. would be at serious risk of moving into a group home or an even more restrictive setting.

49.    C.S.'s autism spectrum disorder causes him great difficulty in managing his behavior and meeting his daily needs. He needs assistance from an adult for calming him during outbursts, assistance in feeding, toileting, and basic hygiene, and in communicating.

50.    C.S. is prone to sudden explosive outbursts, whose severity is compounded by his size. Although he has only recently turned 9, C.S. weighed 190 pounds at his last needs assessment and was 5'2". Because of his large size for his age and the intensity of his emotional outbursts,

his mother needs assistance from a larger adult to prevent C.S. from injuring himself or damaging furniture and the walls of his house.

51.     In late 2015, C.S. was assessed as needing 129 hours of in-home services per month during the school year and 162 hours of in-home services during the summer holidays. He was judged to need full assistance with eating, bathing, toothbrushing, and communication; substantial assistance regarding behavior; and partial assistance with other basic hygiene and toileting needs.

52.     In late 2016, C.S. was assessed with the revised assessment tool. Although C.S.'s needs remained largely unchanged as gauged by the tool, his budgeted hours declined to 96 hours per month during the school year, and 121 hours per month during the summer holidays.

53.     C.S. filed, through his mother, a request for an exception with DHS in November 2016. The request stated that C.S. was using all of the previously budgeted hours for care; that C.S. was large and aggressive, necessitating higher hours; and that C.S. was at-risk of placement outside the home if the hours were not restored to the past level.

54.     Neither C.S. nor his mother were permitted to attend the meeting of the exceptions committee, nor were they asked to clarify, explain, or offer any supplemental evidence. The exception request was denied on December 2, 2016, stating that there was no basis for an exception in the records reviewed.

55.     C.S. also pursued an administrative appeal of the reduction in hours and the denial of his exception request. On January 19, 2017, a hearing was held before an administrative law judge.

56.     The judge heard evidence that C.S. was aggressive and had punched holes in walls, that his mother felt unable to manage his outbursts without assistance, and was considering placing him outside the home if the hours were not increased.

Page 11- CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

57.    Although DHS provides that an exception can be granted where reductions in hours put a child at risk of "institutionalization," a DHS staffer, Mike Parr, testified at the hearing that the word "institutionalization" refers only to placement in "an inpatient setting that offers higher-level medical and psychiatric care." Even if C.S. would be placed out of his parental home and into a group home or foster placement, DHS took the position that this would be a legally acceptable outcome, because such placements did not meet a definition as an institution.

58.    As to the reduction in his hours, the judge found simply that the "number of attendant care hours a DDS-eligible individual may receive is determined exclusively by the individual's assessed service level." That service level is in turn defined exclusively by the outcome of the child's need assessment. The judge was simply unable to consider evidence on direct appeal that the assessment afforded inadequate hours of care.

59.    The judge's March 22, 2017 ruling held that, according to DHS's rules, it could deny services to C.S., regardless of any need not adequately met by those hours afforded through the needs assessment. The judge also held that, using DHS's definition of institutionalization (apparently not defined by rule, but supplied by DHS staff), C.S. was not at risk of institutionalization, even though he might be forced to move to a group home or foster care placement as a result.

*Individual Allegations: K.C.*

60.    K.C. can live at home with her parents, as long as she has certain supports that help her remain in the community. Without those in-home supports, K.C. would be at substantial risk of moving out of her family home and into a group home, foster care placement, or even a nursing home.

61.     K.C.'s disability affects her ability to walk and to move her body. She uses a wheelchair to move around and needs physical assistance to transfer from one position to another, such as moving into a car seat, into bed, into a bathtub, or onto a chair.

62.     K.C.'s disability affects her ability to communicate. She does not speak using clear words, though she does vocalize in a way that her family members and other people close to her can interpret her current mood.

63.     K.C.'s disability affects her ability to eat and to manage her basic hygiene. She needs someone to prepare food for her, to monitor her as she eats to make sure she does not choke, to assist her with toothbrushing, washing, and basic toilet needs.

64.     K.C.'s disability affects her ability to manage her behavior. K.C. has pica, a condition where a person is compelled to pick up inedible items—like buttons, paperclips, mud, or paint chips—and try to eat them. She needs constant attendance and monitoring, during daytime and nighttime hours, to ensure that she does not eat things that will harm her or cause her to choke.

65.     Because of these and other needs for personal care, DHS evaluated K.C.'s personal needs and granted her 605 hours of in-home care in 2016.

66.     When K.C. came up for review in 2017, her behavioral needs had not substantially changed since past evaluations.

67.     However, DHS had reduced the overall award of hours for consumers, and K.C.'s in-home care hours were reduced from 605 hours to only 518 hours. She received a notice dated February 16, 2017 stating that the reduction was "determined on the basis of the needs assessment" conducted in January, without offering an individualized explanation of what, if anything. had changed or how those changes related to the reduction in hours from 605 to 518.

68.     K.C., through her parents, applied for an exception in February 2017, requesting restoration of the 87 hours. K.C. alleged in her exception request that the reduced hours were inadequate to meet her needs.

69.     K.C. and her parents were not allowed to participate in the exceptions process beyond assisting in preparing the application for the exception. They were not allowed to attend the exceptions committee meeting, and no further argument or evidence beyond what was in the application was solicited or permitted.

70.     A few weeks later, they received a denial of the exception request, stating that the exception request had "no indication" of the "need for the 87 additional hours."

71.     K.C. and her parents also submitted an administrative appeal, similarly alleging that the reduction in in-home care hours did not meet her needs.

72.     Following an informal conference in March 2017 with K.C.'s parents and DHS staff prior to any formal administrative appeal hearing, K.C.'s benefits were increased to 541 hours per month, still short of the 605 hours she had in 2016.

73.     The remaining difference between her 2016 and 2017 hours means she will receive see a reduction from roughly 20 hours a day of in-home care to 18 hours, even though she needs constant attention during the day and regular visits at night to make sure she is not eating her bedding or other items in the night.

74.     This reduction of in-home care hours compromises her safety in the home, because she will not have adequate resources to ensure that her behavioral challenges are managed.

*Individual Allegations: T.B.*

75.     T.B. has autism, which affects his ability to manage his hygiene, daily household needs, and maintain appropriate social contacts. He receives in-home care supports to assist him with

cueing to maintain cleanliness and appropriate social behavior. He also needs assistance around laundry and general household cleanliness. Last, he needs assistance with going out into the community and interacting in a socially appropriate manner.

76.    During 2016, T.B. had 39 hours of in-home and community-based services to meet these needs.

77.    In January 2017, T.B. was reassessed with DHS's new needs assessment tool. Although his needs had not substantially changed, he received a notice from DHS stating that his services would be cut to 28 hours a month, without any individualized explanation of the reasons for the cuts.

78.    The notice cited as the legal authority for DHS's actions multiple Oregon Administrative Rules: OAR 943-001-0020(3); OAR 411-450-0060 (7)(b); OAR 411-450-0020 (2),(3), (14),(21); and OAR 411-415-0070(1)(b).

79.    T.B.'s service cuts will hamper his ability to go out into the community, to develop appropriate social relationships, and to maintain hygiene and cleanliness at home.

80.    T.B. receives in-home care through his parents and his grandmother.

81.    T.B. requested an exception but has not had any response to the request as yet.

82.    T.B. was not permitted to participate in the exceptions process or to present any further evidence or arguments beyond those in the initial request.

*Individual Allegations: B.B.*

83.    B.B. has a diagnosis of autism, which has had dramatic effects on his ability to meet his daily needs.

84.    B.B. can walk and change position, but he has poor insight and impulse control. He needs a caregiver with him at all times in the community to ensure he does not run into traffic or get

himself into a dangerous situation. He cannot drive or take public transit by himself and needs all transportation arranged by someone else.

85.     B.B. can meet some of his eating and hygiene needs with partial assistance. He can feed himself, but has no sense of satiety and will eat until he is sick. He also needs his food cut up into small pieces to prevent choking. He can perform basic personal hygiene but needs substantial cueing from others to ensure he meets those needs.

86.     B.B. can speak but tends to have difficulty formulating complex thoughts. To communicate fully and to participate in the community, he needs assistance from others to draw out what he means or what he is feeling and to explain complex concepts to him. He also needs frequent prompting on socially appropriate responses and maintaining personal space. He needs observation in the community to make sure he does not injure himself or elope.

87.     B.B.'s needs were assessed in 2016, and DHS provided him with 277 hours of in-home care services.

88.     In January 2017, B.B.'s needs were reassessed. Although his needs have not substantially changed, his hours of in-home care were reduced from 277 to 197.

89.     B.B.'s most recent notice did not give any individualized explanation for the reduction in services beyond saying that the new needs assessment indicated a reduction in services, nor explain how the needs assessment yielded the specific figure of 197 hours.

90.     The notice cited as the legal authority for DHS's actions multiple Oregon Administrative Rules: OAR 943-001-0020(3); OAR 411-450-0060 (7)(b); OAR 411-450-0020 (2),(3), (14),(21); and OAR 411-415-0070(1)(b).

91.     B.B. requested an exception but has not had any response to the request yet.

92.    B.B. was not permitted to participate in the exceptions process or to present any further evidence or arguments beyond those in the initial request.

*Individual Allegations: T.C.*

93.    T.C. has cerebral palsy, an illness whose severity requires regular assistance for her to live in her home and in the community.

94.    T.C. can communicate with others, as long as she has substantial supports. She does not speak, use sign language, or any assistive technology to communicate. She communicates primarily through nonverbal vocalizations and body language, which requires a family member or someone similarly close to her to interpret her moods and responses during all waking hours.

95.    T.C. goes out into the community only with substantial supports. She needs someone to keep her from walking into traffic or going with strangers that she meets.

96.    T.C. can manage eating and hygiene with substantial assistance. She needs someone to prepare food for her. She can feed herself, but must be watched to ensure she does not simply "cheek" her food and choke once her mouth becomes full. She needs substantial assistance with cleanliness, hygiene, and toileting.

97.    In 2016, T.C. received 469 hours of in-home care hours funded through DHS, based on the assessment of her needs.

98.    In December 2016, her needs were reassessed. On December 9, 2016, DHS issued a notice to her that her hours of in-home care would be reduced from 469 to 327. The notice did not provide an individualized explanation of the reduction in her hours, other than stating that the "service hours noted on the" needs assessment "are 327 hours per month."

99.    DHS's notice to T.C. cited as legal authority only one Oregon Administrative Rule: OAR 411-318-0020. That rule describes what a notification of planned action is and what must be

included in the notice, but it does not explain the substantive law justifying reduction or termination of services.

100.    T.C. did not file an administrative appeal or seek an exception.

## CLASS ACTION ALLEGATIONS

101.    The plaintiffs file this complaint as a class action under Rule 23(b)(2), intending to represent the interests of a broad group of people with intellectual or developmental disabilities whose benefits have been reduced by the Oregon Department of Human Services, through the Office of Developmental Disabilities Services.

102.    The plaintiffs would identify the class as follows: "All people who, as of August 31, 2016, received in-home care benefits through the Office of Developmental Disabilities Services, Oregon Department of Human Services, who have received or will receive a Notification of Planned Action or other notice reducing, suspending, denying, or terminating in-home care services subsequent to that date."

103.    This class of similarly affected plaintiffs are so numerous that they cannot be joined as individual plaintiffs in a single case. DHS has revised its needs assessment tools, as of September 1, 2016, in such a way that virtually every recipient of services will see reductions in service. Almost 8,000 adults and more than 3,000 children were accessing in-home care services between 2015 and 2017, according to a recent budget presentation by the Office of Developmental Disabilities Services.

104.    The questions of law and fact raised herein are common to the whole class. Each consumer in the class received a notice from DHS or one of its contracting county agencies or brokerages. DHS created a common template for notice of service reductions that it asks its contractors to use. It applies a common, secret formula to calculate in-home service benefits for

adults and a similar, secret formula to calculate in-home service benefits for children. The exceptions process and administrative appeals process for all consumers is functionally the same and governed by functionally similar rules.

105. The claims of the named plaintiffs are typical of those within the class. Each member of the class would have a similar claim of inadequacy of notice and lack of due process in determining service cuts. The named plaintiffs include several adults and a child. They include a plaintiff receiving more than 500 hours of care per month, and one receiving less than 30. They include named plaintiffs with a variety of diagnoses typical of the class of consumers with I/DD: cerebral palsy and autism.

106. The representative parties will adequately represent the interests of the class. None of the individual plaintiffs have any particular financial interest that tends to induce them to seeking a self-serving outcome, as opposed to one that benefits the class as a whole. The plaintiffs' attorneys are well-experienced in bringing large, complex class actions and in representing classes of people with disabilities.

107. The plaintiffs seek to formulate a class under Rule 23(b)(2), seeking relief on the grounds that DHS "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ."

108. The relief sought would be applied to the whole class of in-home care recipients, such that the requested relief would be directed to the class as a whole. Particularly, the plaintiffs seek relief altering the needs assessments used by DHS, the notices distributed by DHS, and DHS policies surrounding the exceptions process and administrative hearings.

109.    The plaintiffs intend to file a motion for class certification contemporaneously with the filing of this complaint.

### Claim I: Lack of Adequate Notice Violates the Right to Procedural Due Process Under the Fourteenth Amendment of the United States Constitution (Through 42 U.S.C. 1983) As to All Defendants

110.    The Fourteenth Amendment prohibits any state from depriving any person of "life, liberty, or property, without due process of law . . . ." U.S. Const., Amdt. XIV, Sec. 1.

111.    Under Section 1983, a person may bring a suit to enforce federal constitutional or statutory rights violated under color of state law. 42 U.S.C. 1983.

112.    The reduction of government benefits in disability programs and public welfare programs are a sufficient property interest to require due process protections before any change in status. *Atkins v. Parker*, 472 U.S. 115, 130 (1985); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 266 (1970).

113.    That due process must include a notice reasonably calculated to inform someone of the reasons for the denial of or reduction in service, and a meaningful opportunity to be heard on the question, prior to the reduction in service. *Goldberg*, 397 U.S. at 266-71.

114.    Adequate notice must "give[] an agency's reason for its action in sufficient detail that the affected party can prepare a responsive defense." *Barnes v. Healy*, 980 F.2d 572, 579 (9th Cir. 1992). Due process is not satisfied by a notice that would leave a claimant "guessing what evidence can or should be submitted in response and driven to responding to every possible argument against denial at the risk of missing the critical one altogether." *Gray Panthers v. Schweiker*, 652 F.2d 146, 168-69 (D.C. Cir. 1980).

115.    In the present case, the plaintiffs' home care hours were cut substantially, at the same time that their apparent need for care either remained the same or increased.

Page 20- CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

116.    The reason given for the cuts in service was that the new needs assessment said that the in-home care hours should be cut, without explanation of whether or how her need had changed or how that justified the dramatic reduction in hours. The notice does not distinguish cuts related to changes in the formula from changes in awarded hours relating to increased or decreased need.

117.    The plaintiffs were deprived of due process for lack of meaningful notice of the reason for the actions against them. In part because of that lack of meaningful notice, they cannot expect any meaningful process from any administrative appeal, because it would be impossible to formulate an argument to rebut every single claim DHS could raise on appeal.

118.    The notices given to the plaintiffs fail to provide any kind of individualized notice, but give only a boilerplate notice of reductions in services, a practice prohibited by decades of due process law.

**Claim II: Use of a Secret, Arbitrary Algorithm Violates the Right to Procedural and Substantive Due Process Under the Fourteenth Amendment of the United States Constitution (Through 42 U.S.C. 1983)**
**As to All Defendants**

119.    Whenever a government agency apportions a benefit, procedural due process requires that the agency explain its calculations in a clear manner. Substantive due process requires that the agency uses ascertainable standards to determine the benefit.

120.    Based on the actual notices given to plaintiffs in this case, DHS's model notice, and the publicly available information regarding the calculations in the needs assessments apportioning in-home care hours, consumers cannot meaningfully determine how their benefits are calculated.

121.    The state does make available on its website the spreadsheets used in needs assessment, but the underlying calculations are concealed within the program and not available to the average

user. DHS does not explain this secret, internal algorithm anywhere, stating only that it is a "formula embedded in the functional needs assessment." OAR 411-450-0020(21).

122.   A consumer cannot meaningfully test or understand the formula, except by entering all possible answers to dozens of questions by hand and reviewing the calculated hours of need in each scenario.

123.   "[W]ritten notice must explain the formula by which the benefit amount was calculated." *Ford v. Shalala*, 87 F. Supp. 2d 163, 178 (E.D.N.Y. 1999) *judgment entered sub nom. Ford v. Apfel*, No. CV-94-2736 (CPS), 2000 WL 281888 (E.D.N.Y. Jan. 13, 2000). The risk of wrongful calculation of a benefit is particularly acute where a beneficiary has "no meaningful way to ascertain whether agency calculations as to grant amounts are accurate." *Schroeder v. Hegstrom*, 590 F. Supp. 121, 127 (D. Or. 1984).

124.   A consumer trying to assess whether to appeal a service cut or trying to defend herself at an administrative proceeding will necessarily lack the requisite understanding of the relationship between need and calculated benefit. A consumer trying to defend herself against cuts driven by a secret algorithm in an administrative hearing cannot have a fair or reasonable proceeding.

125.   Because the algorithm is secret and concealed from the consumer, the standards DHS uses are effectively unascertainable, in violation of substantive due process.

**Claim III: DHS's Exceptions Process Violates the Right to Procedural Due Process Under the Fourteenth Amendment of the United States Constitution (Through 42 U.S.C. 1983) As to All Defendants**

126.   The basic premise of due process is that a person should have the right to reasonable notice and a meaningful opportunity to be heard, before deprivation of a protected interest.

127.   DHS denies consumers reasonable notice of the exceptions process because the notice provided to consumers does not mention the exceptions process as a means to challenge the

reduction in hours, nor explain how to apply for an exception. In the initial notice of reduction in services, consumers are given no explanation of their rights or their role in the exceptions process, nor any explanation of what factors the committee will consider, who sits on the committee, what law governs the process, or whether one can appeal the outcome.

128.    DHS denies consumers in the exceptions process the opportunity to participate meaningfully, because consumers do not know what factors were considered in the original award of hours, cannot attend the hearing, do not know what questions the committee focuses on, are not entitled to respond to any inquiries from the committee, and generally are not allowed to have any role in the process, other than by filing the original application for an exception.

129.    The risk of erroneous deprivation of benefits and services through the exceptions process is high because each consumer's disability affects her life in a different manner and generates unique needs. Consumers may not know how to access the exceptions process and cannot meaningfully participate in it to address any questions that may arise.

**Claim IV: The Administrative Appeal Procedures and Rules of DHS Violate the Right to Procedural Due Process Under the Fourteenth Amendment of the United States Constitution (Through 42 U.S.C. 1983) As to All Defendants**

130.    Consumers are denied a meaningful opportunity to be heard in the administrative appeal process because DHS effectively prevents meaningful review of the adequacy of the benefit through a circular definition.

131.    Although consumers are entitled to all services required to meet their basic needs, 42 U.S.C 1392n(k)(1), the Oregon Administrative Rules define the service level for consumers to be whatever level of service the needs assessment tool describes.

132.    An administrative law judge cannot raise the level of service above what the needs assessment permits. OAR 411-450-0020(21); OAR 411-450-0060(7).

133.    The hearing process is not a meaningful opportunity to be heard on whether DHS has met one's legal right to the services she requires, but an elaborate ritual for a Kafkaesque tautology: DHS decides how many hours of care the needs assessment allots, and the needs assessment determines the correct number of hours of care provided. That the assessment might be wrong, inadequate, or not properly capture an individual person's needs is not a permissible basis for review of DHS's decision-making.

134.    Because the administrative hearing process does not permit a meaningful opportunity to review the substantial measures of adequacy of services under federal law, the administrative hearing process violates the Fourteenth Amendment.

### Claim V: The Americans With Disabilities Act, Title II (42 U.S.C. 12131 *et seq.*) As to All Defendants

135.    Title Two of the Americans with Disabilities Act prohibits discrimination against people with disabilities by public entities. 42 U.S.C. 12132.

136.    State agencies providing services must provide them in the most integrated setting possible.   28 C.F.R. § 35.130(d).

137.    Unnecessary confinement, isolation, or segregation of people with disabilities constitutes discrimination because it stems from an irrational belief that people with disabilities cannot or should not participate in public life and because it unreasonably restricts their liberty to participate in that public life. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

138.    Cuts to in-home care services by a state social service agency that exacerbate the risk of isolation and segregation for people with disabilities violate the Americans with Disabilities Act. *M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011) (*en banc*), *as amended* 697 F.3d 706 (9th Cir. 2012) (*en banc*). Cuts to in-home care services that effectively confine someone to her home

Page 24- CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and reduce her ability to have contact with the community, such as by visiting grocery stores, shops, malls, post offices, libraries, public pools, parks, and churches, also violate the integration mandate. 28 C.F.R. § 35.130(d); *see also* 42 C.F.R. § 441.530(a)(1)(i) (defining integrated settings for home and community based services).

139.     DHS, headed by Mr. Saiki, and the Office of Developmental Disability Services, run by Ms. Teninty, are public entities within the meaning of the Americans with Disabilities Act. 42 U.S.C. 12131(1); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 288 (2d Cir. 2003) (Title II suit properly maintained against agency head in official capacity under *Ex Parte Young* theory).

140.     The plaintiffs are people with disabilities within the meaning of the ADA. 42 U.S.C. 12131(2).

141.     The most integrated possible setting appropriate for the plaintiffs are their family homes and communities, if they are provided appropriate supports. 28 C.F.R. § 35.130(d).

142.     They are entitled to live in their family home and receive adequate state support to prevent segregation and isolation from their community on the basis of disability.

143.     The plaintiffs have authority to seek redress for violations of Title II by suit in federal court. 42 U.S.C. 12133; 29 U.S.C. 794a.

### Claim VI: Violation of the Rehabilitation Act (29 U.S.C. 794)
### As to All Defendants

144.     A recipient of federal funds, including Medicaid funds, must not discriminate against people with disabilities.  29 U.S.C. 794.

145.     DHS, the Office of Developmental Disability Services, and CLCM each receive, handle, and disburse federal Medicaid funds and other federal funds.

146.    The Rehabilitation Act's prohibition against discrimination is interpreted coextensively with the ADA. *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended* (Oct. 11, 2001).

147.    Enabling regulations of the Rehabilitation Act, like those of the ADA, require services be provided to people with disabilities in the "most integrated setting" appropriate to the individual. *Compare* 28 C.F.R. 41.51(d) *with* 28 C.F.R. 35.130(d).

148.    The Rehabilitation Act similarly prohibits DHS from limiting in-home services in a way that increases the risk of unnecessary placement in a more restrictive setting, just as the Americans with Disabilities Act does.

149.    The Defendants have violated the plaintiffs' right to receive services in the most integrated setting under the Rehabilitation Act. They have the right to seek redress for such a violation by suit in federal court. 29 U.S.C. 794a.

### Claim VII: Violation of Chapter XIX of the Social Security Act (42 U.S.C. 1396 *et seq*. Through 42 U.S.C. 1983) As to All Defendants

150.    The state of Oregon receives Medicaid funds from the federal government for many consumers with disabilities, including the plaintiffs, under the Community Based Attendant Services and Supports provision, also known as the "K plan." 42 U.S.C. 1396n(k).

151.    Under the K plan provisions, the state must "make available home and community-based attendant services and supports to eligible individuals, as needed, to assist in accomplishing activities of daily living, instrumental activities of daily living, and health-related tasks through hands-on assistance, supervision, or cueing . . . under a person-centered plan of services and supports that is based on an assessment of functional need . . . ." 42 U.S.C. 1396n(k)(1).

152.    DHS has already determined that the plaintiffs are eligible for K plan services. Their

eligibility is not in dispute.

153.    DHS must, having accepted K plan funds, provide those attendant care services "as

needed," not to the extent it feels capable of funding them. *Id.* Unlike other Medicaid programs

where a state can ration its services under certain restrictions, DHS must fully meet any showing

of need in serving consumers under the K plan. While DHS may place limits on the "amount,

duration, and scope" of K plan assistance, it must do so in a way that "reasonably achieve[s] the

purpose of the service." 77 Fed. Reg. 26833 (May 7, 2012).

154.    To the extent that DHS relies on parents' or other relatives' involuntary assumption of

more hours of unpaid care for an adult child than an ordinary parent would provide for an

ordinary adult child without a disability, DHS violates federal law. 42 C.F.R. 441.540(b)

(familial natural supports can only substitute for paid attendant care when and to the extent they

"are provided voluntarily to the individual in lieu of an attendant").

155.    Although DHS describes its assessment process as a "needs assessment," it has

conducted no objective or scientific assessment of its assessment tool to ensure that it accurately

determines individual need or that the number of hours it budgets to any individual client

properly describes the need.

156.    The needs assessment currently represents little more than guesswork by DHS staff about

how many hours might be needed by any single consumer and broad conjecture about how many

hours of assistance any consumer needs.

157.    The needs assessment also relies exclusively on broad qualitative categories, affording no

individualized determinations of need within those categories. Two different people might need

"full assists" in ambulation, but the number of hours per month actually needed for ambulation

assistance might vary widely from one individual to the next. This omission is at odds with the federal requirement that such a program be "person-centered" and "consumer controlled." 42 U.S.C. 1396n(k)(1)(A)(i) & (k)(3)(B).

158.    For instance, although the written notes on T.C.'s needs assessment state that she needs "[e]xpressive and [r]eceptive communication supports all waking hours," her assessment allows her only 327 hours a month for *all* of her needs (not just communication supports). All waking hours in a 30-day month for someone sleeping 8 hours a day would be 480 hours. DHS's cuts left T.C. without adequate support for her communications needs for hours each day. An ordinary adult, with or without a disability, would find hours of enforced silence each day intolerable.

159.    Under Chapter XIX of the Social Security Act, the plaintiffs are entitled to the home- and community-based attendant services that they need to accomplish the needs of daily living, in a manner directed by the individual consumer or her representative. DHS's denial of services adequate to meet consumer need violated their rights under the Social Security Act.

160.    The plaintiffs are entitled to bring an action for individual relief of any violation of federal constitutional or statutory rights under color of state law. 42 U.S.C. 1983.

161.    The provisions of 42 U.S.C. 1396n(k) contain the kind of broad, rights-creating language enforceable under 42 U.S.C. 1983.

**CLAIMS FOR RELIEF**

162.    In light of the above described violations of law, the plaintiffs ask, on their own behalf and on behalf of those similarly situated, that the Court enter an order:

A.    declaring that the protocols used for assessing individual need violate the Due Process Clause, the Social Security Act, the Americans with Disabilities Act, and the Rehabilitation Act;

B.      declaring that the current means of providing notice of reduction, suspension, denial, or termination of services violate the Due Process Clause;

C.      declaring that DHS's current practices regarding the exceptions process and the administrative hearing process violate the Due Process Clause;

D.      declaring that the use of a secret algorithm to calculate benefits violates the Due Process Clause;

E.      immediately enjoining the reduction of in-home care hours for the named plaintiffs and those similarly situated and order defendants to restore the level of service to at least that afforded as of August 31, 2016;

F.      ordering DHS to rescind any current notices of reduction, denial, or termination of benefits to consumers with developmental or intellectual disabilities receiving in-home care and supports and to restore prospectively the prior level of benefit as of August 31, 2016 or grant the level of benefit sought, whichever is greater;

G.      ordering DHS to halt future reductions, denials, and terminations of benefits for consumers with developmental or intellectual disabilities receiving in-home care and supports until DHS submits to the court an approved plan that meets the following criteria:

    i.      the plan uses an assessment tool, whose criteria are publicly available, based in scientifically acceptable criteria, and calculated to adequately capture individual need;

    ii.     the plan details improved notification procedures to inform consumers, in a manner reasonably calculated to inform them of the factual and legal basis for the reduction, denial, or termination; and

    iii.    the plan provides for adequate and separate procedures to review the adequacy of services to meet the consumer's needs and whether a consumer is put at increased risk of

removal to a less integrated setting by the reduction, suspension, denial, or termination in

services;

H.       certifying the present suit as a class action;

I.       declaring that the plaintiffs are a prevailing party;

J.       granting reasonable attorney's fees and costs to the plaintiffs; and

K.       granting other such appropriate relief as the court deems just and proper.


DATED this 10th day of April, 2017.

                    DISABILITY RIGHTS OREGON

                    /s/ Kathleen L. Wilde
                    Kathleen L. Wilde, OSB 971053
                    kwilde@droregon.org
                    Thomas Stenson, OSB 152894
                    tstenson@droregon.org
                    Gordon Magella, OSB 152673
                    gmagella@droregon.org
                    610 SW Broadway, Suite 200
                    Portland OR 97205
                    Tel:     (503) 243 2081
                    FAX:   (503) 243 1738
                    *Counsel for Plaintiffs*